UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
DONALD A. DIRENZO, SR. and JOSEPH R.
DIRENZO, SR.,

                                          Plaintiffs,

    -against-

TASA CONSULTING LLC, NATIVE
AMERICAN ENERGY GROUP, INC., VICTOR
WANG, JOSEPH D'ARRIGO, and DARA
SNEDDON,

                                          Defendants.
------------------------------------------------------------------x

**REPORT AND RECOMMENDATION**
21-cv-3027 (EK)(SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

       Presently before the Court in this Securities Exchange Act litigation, on referral from the Honorable Eric R. Komitee for Report and Recommendation, are certain Defendants' motions to dismiss Plaintiffs' complaint for insufficient service of process. *See* Docket Entry ("DE") [11], [12]. By way of Complaint dated May 27, 2021, Plaintiffs Donald A. DiRenzo, Sr. ("Donald") and Joseph R. DiRenzo, Sr. ("Joseph," together with Donald, "Plaintiffs") bring this action against TASA Consulting LLC ("TASA"), Native American Energy Group, Inc. ("NAEG"), Victor Wang ("Wang"), Joseph D'Arrigo ("D'Arrigo"), and Dara Sneddon ("Sneddon," together with Wang, the "Individual Defendants," and collectively with TASA, NAEG, Wang and D'Arrigo, "Defendants"), alleging violations of: (i) Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 15 U.S.C. § 78t(a); and (ii) Securities and Exchange Commission ("SEC") Rule 10b-5,

1

17 C.F.R. § 240.10b-5; as well as state law claims for (iii) fraud, (iv) fraud in the inducement, (v) unjust enrichment, and (vi) breach of fiduciary duty.  *See* Complaint ("Compl."), DE [1].

For the reasons set forth herein, the Court respectfully recommends denying the motions.[1]

## I. BACKGROUND

Unless otherwise indicated, the facts set forth herein are taken from the Complaint and are accepted as true for purposes of the instant motions.

### A. Relevant Facts

Plaintiffs, father and son, are New York residents.  *See* Compl. ¶¶ 3-4.  TASA and NAEG are a Delaware limited liability company and corporation, respectively, with principal places of business in New York.  *See id.* ¶¶ 5, 7.  The Individual Defendants are individuals residing in New York.  *See id.* ¶¶ 9, 11.  Sneddon is Wang's daughter and a member of TASA, facilitating all communications and financial transactions between the company and Plaintiffs and managing TASA's branding and marketing.  *See id.* ¶ 11, 143-44.

#### 1. Plaintiffs' Personal Relationships with Wang

Joseph and Wang became friends while attending neighboring Long Island high schools in the 1980s, and maintained contact while attending separate out-of-state colleges.  *See id.* ¶¶ 16-17.  In or around 1989, Wang was associated with

---

[1] In making this recommendation, the Court considers the Individual Defendants' Request for Permission to Respond to Declaration of Massimo F. D'Angelo in Opposition to Dismiss 12(b)(5) Motion, DE [20], as the Individual Defendants' reply in support of their motions, and respectfully recommends granting that request.

2

Stratton Oakmont, the brokerage firm that defrauded investors, was eventually shuttered due to its misconduct, and was depicted in the film "The Wolf of Wall Street." *See id.* ¶ 18. Wang and his partners purchased securities brokerage firm Duke & Co., Inc. ("Duke") in or around 1993 and began operating the firm in New York City, with Wang acting as Duke's chairman from 1993 to 1998. *See id.* ¶¶ 19-20.

According to Plaintiffs, Wang and his partners at Duke defrauded investors by, *inter alia*, manipulating the immediate after-market of the initial public offering of a company and selling securities at artificially inflated prices, ultimately cheating investors out of approximately $650 million. *See id.* ¶¶ 21-22. Wang pled guilty to an information charging one count of conspiracy to commit securities fraud and one count of conspiracy to launder money in 1999. *See id.* ¶ 23. The SEC instituted administrative proceedings against Wang and barred him from associating with any broker or dealer in 2000, and the Financial Industry Regulatory Authority ("FINRA") barred Wang from acting as a broker or otherwise associating with broker-dealer firms. *See id.* ¶¶ 24-25. Wang pled guilty to another information charging conspiracy to commit securities fraud in 2000 and was incarcerated and ordered to pay restitution in an amount exceeding $11.1 million, a "substantial amount" of which Plaintiffs maintain remains unpaid. *See id.* ¶¶ 26-28.

Plaintiffs allege that, while incarcerated in August 2014, Wang directed his ex-wife to contact Joseph and request money and other assistance to get him out of prison. *See id.* ¶ 30. Joseph attempted to help Wang by, *inter alia*, searching for an

3

attorney to represent him, visiting him in prison, inviting him to reside in Joseph's home for about 15 months, and assisting Wang's family with legal matters. *See id.* ¶¶ 33-35. Plaintiffs further allege that they loaned Wang approximately $250,000 since 2015 to help him with personal and legal expenses, and an additional $170,000 to "rescue his home" in 2017. *See id.* ¶¶ 36-37. In December 2018, Sneddon signed the note as to one of Plaintiffs' loans on Wang's behalf. *See id.* ¶ 39. Plaintiffs assert that they also loaned or invested money to finance Wang's business ventures, including a failed restaurant that resulted in a loss of about $300,000 to Plaintiffs and a blockchain conference that Wang organized that led to a $250,000 loss for Plaintiffs. *See id.* ¶¶ 40-41.

### 2. Plaintiffs' Investment in NAEG

Plaintiffs maintain that in or around 2017, Wang approached Joseph and asked him to invest in NAEG, a company specializing in oil, natural gas and alternative energy systems. *See id.* ¶ 42. Wang and D'Arrigo, NAEG's president and chief executive officer, worked together on a prior business venture in the 1990s and were good friends. *See id.* ¶ 43. Plaintiffs allege that D'Arrigo emailed Joseph in September 2017, attaching a proposed subscription agreement, and that one month later, orally represented to Joseph that the company had been delisted from trading and was raising funds to be relisted on a national stock exchange. *See id.* ¶¶ 44-46. According to Plaintiffs, in reliance on these representations, Joseph invested an initial $50,000 for one million shares of NAEG in or around December 2017, followed by subsequent investments of $100,000 and $150,000, respectively. *See id.* ¶¶ 47-49.

4

Plaintiffs allege that Wang and D'Arrigo did not disclose to Joseph that NAEG entered into a contract with TASA to provide "strategic services" to NAEG, including developing a corporate strategy, facilitating growth, evaluating strategic relationships and assisting with certain projects, in exchange for over two million shares of NAEG's stock.  *See id.* ¶¶ 50-52.

Plaintiffs allege that NAEG paid Wang $7,500 per month as a "consulting" fee, and that Wang exercised "complete control and domination over TASA with respect to transactions relating to NAEG," including inducing Joseph to invest in the company.  *See id.* ¶¶ 53-55.  According to Plaintiffs, Wang and TASA acted as agents and brokers for NAEG in soliciting the sale of unregistered securities to Joseph and others, in violation of the SEC's order barring Wang from associating with any broker or dealer and of FINRA's directive barring him from acting as a broker or otherwise associating with any broker-dealer firm.  *See id.* ¶¶ 56-58.  Plaintiffs further allege that NAEG used a portion of Joseph's investment to pay Wang and TASA for their services, and concealed Wang's and TASA's agreements with NAEG so that Wang would appear independent and unconflicted to induce Joseph to invest.  *See id.* ¶¶ 59-60.  Joseph maintains that, had he known about Wang's and TASA's conflicts of interests with respect to NAEG, he would not have invested in the company.  *See id.* ¶ 61.

Months after failing to respond to Joseph's emails inquiring as to NAEG's relisting, Wang and members of TASA emailed Joseph a document providing additional due diligence regarding the company on November 27, 2018.  *See id.* ¶¶

5

63-67. The due diligence report included statements that the anticipated total number of shares issued and outstanding would be in the 100 million share range upon relisting, as well as that foreign investor SJ Global Investment Worldwide Ltd was anticipated to participate in NAEG's capital raise. *See id.* ¶¶ 68-70.

Plaintiffs maintain that in September 2019, an attorney with the New York State Office of the Attorney General's Investor Protection Bureau (the "OAG") contacted Joseph regarding its ongoing investigation into NAEG, subsequent to which Joseph repeatedly contacted D'Arrigo and other NAEG representatives requesting details about the relisting and the OAG's investigation. *See id.* ¶¶ 74-75. On November 7, 2019, Joseph and nonparty Dee Jae Diliberto, who allegedly also purchased shares of NAEG at Wang's urging, sent NAEG and its representatives a joint letter demanding, *inter alia*, that the company provide them with financial documents and a specific relisting date, as well as explain the basis and nature of the OAG investigation, but D'Arrigo and NAEG's representatives refused. *See id.* ¶¶ 76-77.

On January 28, 2020, the Connecticut Banking Commissioner found that NAEG and D'Arrigo, among others, violated the state's security laws by, *inter alia*, selling unregistered securities to investors pursuant to, according to Plaintiffs, the same documents NAEG presented to Joseph to induce his investment. *See id.* ¶ 78. The order required NAEG to provide a list of Connecticut investors that purchased NAEG securities and reimburse them. *See id.* ¶ 79. Plaintiffs assert that NAEG has not finalized any relisting of the company on any stock exchange to date, and that the

6

representations regarding the purported relisting were false, rendering Joseph's shares "far less" than the amount he paid for his investment. *See id.* ¶¶ 83-87.

### 3. Plaintiffs' Investment in TASA's Hemp Harvesting Business

Plaintiffs allege that in or around October 2019, Wang requested that Plaintiffs lend $350,000 to Peak Summit Labs, LLC ("Peak Summit"), which Wang operates through his family members, TASA and other companies affiliated with him, to engage in a business legally producing and distributing cannabidiol ("CBD") oil. *See id.* ¶¶ 90-91. Wang represented to Plaintiffs that TASA and Peak Summit secured a "guaranteed deal" that would generate $1.5 million in gross revenue to process several hundred thousand pounds of hemp into CBD oil. *See id.* ¶ 92. Plaintiffs provided an initial $140,000 loan to Peak Summit to fund the business, and, *via* a promissory note dated October 15, 2019, Defendants agreed to repay the loan, plus interest, on May 15, 2020. *See id.* ¶¶ 93-94. Wang solicited a separate $210,000 investment from Plaintiffs for a business harvesting hemp in Oregon that TASA would operate, after representing to Plaintiffs that they would receive an interest in that business' profits. *See id.* ¶¶ 95-96. Plaintiffs allege that, after expressing their reluctance to make the $210,000 investment, Wang "grossly inflated and exaggerated the anticipated revenues" from the business, even after Joseph questioned the veracity of the figures. *See id.* ¶¶ 97-107, 138. Defendants refused to execute documents memorializing the terms of the investment, despite Plaintiffs' requests. *See id.* ¶¶ 116-17.

TASA ultimately harvested approximately 7,500 pounds of hemp, but failed to properly store and sell it, after which it spoiled and was rendered "worthless." *See id.* ¶ 119. Plaintiffs maintain that TASA was responsible for operating a lab in Colorado on Peak Summit's behalf to produce CBD oil, and that Sneddon was personally involved in setting up the lab, as well as managing its logistics and exercising "complete control and domination over TASA" with respect to Plaintiffs' investment. *See id.* ¶¶ 120-23 147. When Joseph visited the lab in or around February 2020, he found it "thoroughly unsanitary, unprofessional, and dangerous." *See id.* ¶¶ 124-26. Plaintiffs allege that Defendants' failure to install a security alarm at the lab resulted in the theft of the hemp inventory. *See id.* ¶¶ 127-28. Moreover, Plaintiffs assert that Defendants mismanaged the company's finances, forcing Plaintiffs to pay TASA's operating expenses. *See id.* ¶ 129. TASA ultimately returned $50,000 of Plaintiffs' investment, leaving $160,000 unaccounted for, along with the operating expenses, with no accounting or explanation. *See id.* ¶¶ 130-36. Plaintiffs maintain that Peak Summit defaulted on the $140,000 loan in May 2020. *See id.* ¶ 139.

**B.    Procedural History**

Based on the above, Plaintiffs commenced this action on May 27, 2021. *See generally* Compl. The Complaint seeks damages and injunctive relief, and alleges six causes of action:  (i) violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5; (ii) violations of Section 20(a) of the Exchange Act; (iii) fraud; (iv) fraud in the inducement; (v) unjust enrichment; and (vi) breach of fiduciary duties. Plaintiffs'

8

process server initially attempted service of the summons and Complaint on each of the Individual Defendants on June 4, 2021, at the gated complex in which both live. *See* DE [7], [8].  The security guard informed the process server that Wang requested he return the following day.  *See id.*  On June 5, 2021, the process server returned, but Wang instructed the guard not to let him through.  *See id.*  As a result, the process server served the security guard and advised him to provide the papers to the Individual Defendants.  The process server then mailed the summons and Complaint to the Individual Defendants by First Class Mail on June 7, 2021.  *See id.*

On June 29, 2021, the Individual Defendants moved to dismiss the Complaint on the grounds that it was not properly served upon either of them.  *See* Defendant Victor Wang's Motion to Dismiss ("Wang Mem."), DE [11]; Defendant Dara Sneddon's Motion to Dismiss ("Sneddon Mem."), DE [12].  Plaintiffs oppose the motions.  *See* Memorandum of Law in Opposition to Defendants Victor Wang's and Dara Sneddon's Motions to Dismiss ("Pl. Opp."), DE [19-5].  For the reasons set forth below, the Court respectfully recommends denying the motions.

## II. LEGAL STANDARDS

The Individual Defendants move to dismiss for insufficient service of process, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(5).

"'Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied.'"  *Dynegy Midstream Servs. v. Trammochem*, 451 F.3d 89, 94 (2d Cir. 2006) (quoting *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 104, 108 S.Ct. 404, 409 (1987)).  On

9

a motion to dismiss pursuant to Rule 12(b)(5) for deficient service of process, "the plaintiff bears the burden of establishing that service was sufficient." *Khan v. Khan*, 360 Fed.Appx. 202, 203 (2d Cir. 2010) (citing *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 298 (2d Cir. 2005)).  Plaintiffs must meet this burden by making a prima facie case of proper service "through specific factual allegations and any supporting materials." *Kwon v. Yun*, No. 05 Civ. 1142, 2006 WL 416375, at *2 (S.D.N.Y. Feb. 21, 2006) (citations omitted); *see also Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998).  In this regard, conclusory statements are not sufficient to overcome a defendant's sworn affidavit that service was improper. *Darden v. DaimlerChrysler N. Am. Holding Corp.*, 191 F.Supp.2d 382, 387 (S.D.N.Y. 2002).  In resolving a Rule 12(b)(5) motion to dismiss, "a Court must look to matters outside the complaint to determine whether it has jurisdiction." *Mende v. Milestone Tech., Inc.*, 269 F.Supp.2d 246, 251 (S.D.N.Y. 2003) (quoting *Darden*, 191 F.Supp.2d at 387).

Under Rule 4 of the Federal Rules of Civil Procedure, service may be affected by:

> (1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or
> (2) doing any of the following:
> (A) delivering a copy of the summons and of the complaint to the individual personally;
> (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or
> (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed.R.Civ.P. 4(e).  Rule 308 of the New York Civil Practice Law and Rules ("CPLR") states that an individual may be served:

10

> by delivering the summons within the state to a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business. . . .

N.Y. C.P.L.R. § 308(2); *see also* N.Y. C.P.L.R. § 308(6) ("'[A]ctual place of business' shall include any location that the defendant, through regular solicitation or advertisement, has held out as its place of business."). The purpose of the service requirements is "to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657 (1950); see also *Durant v. Traditional Invs., Ltd.*, No. 88 CIV. 9048, 1990 WL 33611, *3 (S.D.N.Y. Mar. 22, 1990) ("[W]hen a defendant receives actual notice of a lawsuit brought against him, technical imperfections with service will rarely invalidate the service").

In New York, "[o]rdinarily, a process server's affidavit of service constitutes prima facie evidence that the defendant was validly served." *U.S. Bank, N.A. v. Peralta*, 142 A.D.3d 988, 988, 37 N.Y.S.3d 308, 309-10 (2d Dep't 2016); *see also U.S. Bank, N.A. v. Tauber*, 140 A.D.3d 1154, 1155, 36 N.Y.S.3d 144, 146 (2d Dep't 2016). Nevertheless, "when a defendant submits a sworn denial of receipt of service containing specific facts to refute the statements in the affidavit of the process server, the prima facie showing is rebutted and the plaintiff must establish personal jurisdiction by a preponderance of the evidence at a hearing." *Peralta*, 142 A.D.3d at 988–89, 37 N.Y.S.3d at 310; see also *Tauber*, 140 A.D.3d at 1155, 36 N.Y.S.3d at 146; *Matter of MBNA Am. Bank, N.A. v. Novins*, 123 A.D.3d 832, 832-33, 999 N.Y.S.2d

11

121, 122 (2d Dep't 2014). "A hearing is not required where the defendant fails to swear to specific facts to rebut the statements in the process server's affidavits." *Peralta*, 142 A.D.3d at 989, 37 N.Y.S.3d at 310 (internal quotations and citations omitted).

### III. DISCUSSION

Applying these standards, and for the reasons set forth below, the Court respectfully recommends denying the Individual Defendants' motions to dismiss.

The Individual Defendants argue in their motions that they were not properly served with the summons and Complaint when the process server left them with their gated community's security guard and subsequently mailed them because they "do[] not reside . . . in the guard booth described, and in fact [their] residence is at some distance" from the booth. *See* Wang Mem. ¶ 4; Sneddon Mem. ¶ 4. Moreover, the security guard is not related to either of the Individual Defendants, nor does he reside with or near them. *See* Wang Mem. ¶ 7; Sneddon Mem. ¶ 7. In fact, the Individual Defendants maintain that they never received the papers from a security guard, that they do not know who the security guard the process server approached is, and that they did not provide authority for anyone to accept service on either of their behalf. *See* Wang Mem. ¶¶ 8-9; Sneddon Mem. ¶¶ 8-9. Finally, the Individual Defendants argue that they never received copies of the summons and Complaint via First Class Mail. *See* Wang Mem. ¶ 10; Sneddon Mem. ¶ 10.

Plaintiffs' affidavits of service constitute prima facie proof of proper service upon the Individual Defendants. *See Bankers Trust Co. of Cal. v. Tsoukas*, 303 A.D.2d

12

343, 343-44, 756 N.Y.S.2d 92, 94 (2d Dep't 2003). The process server averred that he was denied entry to the Individual Defendants' residence within the gated community when "Victor [Wang] instructed security not to let [him] through." DE [7], [8]. He therefore left the summons and Complaint with "Alexander 'Doe,' Security Guard," and "advised him to give [the] papers" to the Individual Defendants. *See id.* In circumstances like those here, where a process server has not been permitted access to the specified apartment or is advised that the intended party is not home, a security guard or doorman has been found to be a person of suitable age and discretion within the contemplation of CPLR 308(2). *See, e.g., Gudavadze v. Kay*, 556 F. Supp. 2d 299, 302 (S.D.N.Y. 2008) (concluding that service by leaving a copy of the summons and complaint with the doorman and mailing a second copy to the residence complied with Rule 4(e) of the Federal Rules of Civil Procedure as well as section 308(2), as it constituted "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," and was "not substantially less likely to bring home notice than other of the feasible and customary substitutes.") (internal quotations and citations omitted); *Braun v. St. Vincent's Hospital & Medical Center*, 57 N.Y.2d 909, 910-11, 442 N.E.2d 1274, 1274 (1982); *F.I. duPont, Glore Forgan & Co. v. Chen*, 41 N.Y.2d 794, 797, 396 N.Y.S.2d 343, 346 (1977) ("[I]f a process server is not permitted to proceed to the actual apartment by the doorman or some other employee, the outer bounds of the actual dwelling place must be deemed to extend to the location at which the process server's progress is arrested."); *Bank of Am., N.A. v.*

13

*Grufferman*, 117 A.D.3d 508, 508, 985 N.Y.S.2d 532, 533 (1st Dep't 2014); *Costine v. St. Vincent's Hospital & Medical Center*, 173 A.D.2d 422, 422, 570 N.Y.S.2d 50, 51 (1st Dep't 1991) (Service on a guard outside a gated community is a proper location for service in New York, as the "outer bounds of defendant's actual dwelling place [are] deemed to extend to the security booth.").

Nevertheless, Plaintiffs must also show that the guard "exhibited sufficient maturity and responsibility under the circumstances," and that the other requirements of service under CPLR 308(2) were met. *See Costine*, 173 A.D.2d at 422, 570 N.Y.S.2d at 51. Courts in New York have often concluded that security guards and doormen are sufficiently mature and responsible for purposes of effectuating service. *See, e.g.*, *Board of Managers of Le Trianon Condominium v. 1439 Realty Corp.*, 186 A.D.2d 437, 438, 588 N.Y.S.2d 565, 566 (1st Dep't 1992) ("By screening the visitor and representing that he would pass along the legal papers to defendant resident, the guard exhibited sufficient maturity and responsibility for purposes of service pursuant to CPLR 308(2).") (internal citations and quotations omitted).

Finally, Individual Defendants' mere denials of the receipt of the summons and Complaint by mail, without further probative facts, are insufficient to overcome the presumption of delivery that attaches to a properly mailed letter. *See Dean v. Sarner*, 201 A.D.2d 770, 771, 607 N.Y.S.2d 485, 485 (3d Dep't 1994); *Public Adm'r of County of N.Y. v. Markowitz*, 163 A.D.2d 100, 101, 557 N.Y.S.2d 348, 348 (1st Dep't 1990).

Accordingly, the Court recommends denying the Individual Defendants' motions to dismiss the Complaint for insufficient service of process.

## IV. CONCLUSION

For the reasons stated above, the Court respectfully recommends that the Individual Defendants' motions to dismiss be denied, and that they be directed to answer or otherwise respond to the substance of the Complaint.

## V. OBJECTIONS

A copy of this Report and Recommendation is being served on Plaintiffs by electronic filing on the date below. Plaintiffs are directed to serve a copy of it on all Defendants via first-class mail and file proof of service by ECF within three days of the date below. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72; *Ferrer v. Woliver*, No. 05-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:    Central Islip, New York
          October 20, 2021

                                        /s/ Steven I. Locke
                                        STEVEN I. LOCKE
                                        United States Magistrate Judge